John LOMBARD, Plaintiff,

v.

The BOARD OF EDUCATION OF the CITY OF NEW YORK, Defendant.

No. CV 85–2709 (ADS).

United States District Court,
E.D. New York.

March 3, 1992.

John F. Lombard, pro se.

Victor A. Kovner, Corp. Counsel (Paul Marks, Isaac Klepfish, of counsel), New York City, for defendant.

## MEMORANDUM AND ORDER

SPATT, District Judge.

This is a lawsuit by a licensed teacher based on the alleged deprivation of a property right without Due Process of law within the meaning of the Fourteenth Amendment. The property right at issue is the right of a licensed teacher to a meaningful opportunity to seek employment in the New York City Public School System. This action is one brought directly under the Due Process clause of the Fourteenth Amendment and not under a Section 1983 theory.

Before getting into the facts of this particular lawsuit, the Court will review the extensive prior litigation underlying this plaintiff's continuous attempts to obtain employment as a teacher in the school system administered by the defendant Board of Education of the City of New York (the "Board").

## BACKGROUND

As background only, this Court adopts portions of the factual statements set forth in the opinion of Judge Edward R. Korman dated October 29, 1986 rendered in regard to the Board's motion for summary judgment, and in the opinion of the Second Circuit in *Lombard v. Board of Education of the City of New York,* 502 F.2d 631 (2d Cir.1974).

On September 1, 1966, the plaintiff was assigned as a teacher at P.S. 151 in the New York City public school system and commenced a three year probationary period.

Although the plaintiff initially received a satisfactory rating during the probationary period, the principal of P.S. 151 eventually gave the plaintiff an "unsatisfactory" rating and submitted a report to the Board recommending discontinuance of his probationary appointment. The report further recommended that the plaintiff be directed to submit to a medical examination to determine his fitness to teach. In May and June 1969, the plaintiff was examined by Board physicians, was found medically unfit for teaching duties and was placed on an involuntary medical leave of absence until January 31, 1970. After additional medical examinations, the leave of absence was extended to June 30, 1970.

On April 20, 1970, a hearing was held before a Committee of the Superintendent of Schools concerning the plaintiff's probationary status. At this hearing, the plaintiff was permitted to present evidence but he could not cross-examine the reports of the principal and the physicians. The Committee recommended that the plaintiff's probationary appointment be discontinued, based, essentially on his "illogical and disoriented conversation." On June 11, 1970, the Local School Board adopted the recommendation of the Committee and voted to terminate the plaintiff's probationary appointment. The plaintiff's license was then either revoked or deemed revoked. On May 26, 1971, the plaintiff's file number was placed in a circular distributed to superintendents and principals indicating that he could not be employed in any public school because of the discontinuance of his probationary appointment.

## PRIOR LITIGATION

In the state court, the plaintiff brought two Article 78 proceedings in which he challenged both the forced leave of absence and the determination to discontinue his probationary appointment. Both of these proceedings were dismissed. The second Article 78 proceeding seeking to review the termination of his probationary appointment was affirmed by the Appellate Division and leave to appeal was denied by the New York Court of Appeals.

In the Federal Court, in 1972 the plaintiff commenced a Section 1983 action alleging civil rights violations, challenging both the termination of his employment as a probationary teacher and his disqualification from teaching with a substitute license and seeking reinstatement of his license, back pay and damages. This action was dismissed by Judge Travia, without opinion, on the ground that the complaint failed to state a cause of action.

On appeal, the Second Circuit reversed in an opinion by Judge Gurfein, finding that although "Lombard did not have tenure and, therefore, presumptively had no property right either as a probationary or substitute teacher ... he was deprived [by the recommendation of the Committee without his being given the right to confront witnesses] of his reputation as a person who was presumably free from mental disorder" (*Lombard v. Board of Education*, 502 F.2d 631, 637 [2d Cir.1974], *cert. denied* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 [1975]). The Court held that as a result of the charge of mental illness leveled against him, without the right to confront witnesses, the plaintiff "may claim a deprivation of liberty under the due process clause of the Fourteenth Amendment."

On remand, Judge (now Chief Judge) Platt dismissed the action after trial in *Lombard v. Board of Education*, 440 F.Supp. 577 (E.D.N.Y.1977). Subsequent to the Second Circuit decision in *Lombard*, the Supreme Court made it clear that to constitute a deprivation of liberty interest, the stigmatizing information must be both false and made public. (*See Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 [1977]; *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 [1976]; *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 [1976]; *Gentile v. Wallen*, 562 F.2d 193 [2d Cir.1977]). Judge Platt concluded that such evidence was lacking and dismissed the plaintiff's deprivation of liberty claim. With regard to the plaintiff's property interest claims, Judge Platt held that the plaintiff's claim for reinstatement was moot because the Board had in fact recognized the plaintiff's license as valid and reinstated by reason of a decision of the Commissioner of Education in *Matter of Baronat*, 11 Ed.Dept.Rep. 150 (1972). From April 26, 1973 and thereafter, the Board considered the plaintiff's license to be in full force and effect. Accordingly, Judge Platt concluded that it was unnecessary for him to reach the issue of whether the prior revocation of the license deprived Lombard of a property interest.

## THIS LAWSUIT

The plaintiff alleges in this action that although his license was not formally revoked and has, in any event, been reinstated since April 26, 1973, his license has been "constructively revoked" because the defendant Board has prevented him from obtaining employment anywhere in the New York City public school system (Complaint ¶¶ 47, 58). Specifically, the plaintiff asserts that the defendant Board has, without a hearing, denied him "the right to work under his license and has denied him the benefits of such license" (Complaint ¶ 48), that "the Board of Education and/or its administration refus[ed] to grant [him] a teaching assignment" (Complaint ¶ 56), that "plaintiff responded to an advertizement [sic] and on December 16, 1981, plaintiff was accepted in a program for training for 'Special Education' classes" (Complaint ¶ 31), that on December 18, 1981, without cause, plaintiff was told that he would not be permitted to remain in the program and he was told to leave" (Complaint ¶ 32), that the Board refused to refer him to community school boards for consideration for employment (Complaint ¶¶ 26–44), and that he was unable to obtain employment by approaching the Central Board or the local

school districts directly, except sporadically as a substitute teacher.

The plaintiff further alleges that in District 25 and District 17 he was refused work as a regular teacher (Complaint ¶¶ 36, 41), was only permitted to work on a per diem basis, and was told at a recruiting conference that "you do not belong here" (Complaint ¶ 51).

In sum, the thrust of the plaintiff's complaint is that even though he has a valid teacher's license, it has been "constructively revoked" by reason of the Board's actions in preventing him from working as a teacher in any of the local school boards. In the complaint, the plaintiff alleged that these acts deprived him of his rights to property and liberty without due process of law and of his right to equal protection of the law, in violation of the Fourteenth Amendment.

## JUDGE KORMAN'S DECISION
### OF 10/29/86

As to the plaintiff's due process "property rights" claim, Judge Korman held that a license "confers no more than a mere expectancy of employment, and does not confer any claim to a specific position or, for that matter, to any further employment" (*Matter of Lowenstein*, 9 Ed.Dept.Rep. 207, 209 [1970]). Further, as a licensed but untenured teacher "plaintiff has no constitutionally protected property interest in employment as a teacher, and his allegations concerning the Board's refusal, either directly or indirectly, to afford him employment fall far short of stating a cause of action for deprivation of property without due process of law" (*see Ricca v. Board of Education*, 47 N.Y.2d 385, 393, 418 N.Y.S.2d 345, 391 N.E.2d 1322 [1979]; *Gordon v. Anker*, 444 F.Supp. 49, 51–53 [S.D.N.Y.1977]; *Matter of Mancini*, 14 Ed. Dept.Rep. 420, 421–422 ([1975]).

Plaintiff's second theory with regard to his claim to a property interest was based on an alleged entitlement to a meaningful opportunity to apply for a teaching position. It is this opportunity which the plaintiff contends is a property right warranting due process protection. He claims he has

been deprived of this right as a result of the conduct of the defendant Board in directing the community school districts not to hire him.

Judge Korman noted that the impetus for then Commissioner of Education Nyquist's decision in *Baronat* was the enactment, in 1969, of New York Education Law Article 52–A, which "decentralized" the single New York City School District into thirty-one separate "community school districts." The power to appoint and dismiss elementary school teachers was taken from the Central Board and vested in the local community school districts. As stated by Commissioner Nyquist in *Baronat*, this statute has had a significant effect on the value and utilization of a New York City teacher's license, as follows:

"Prior to the enactment of the decentralization statute and the creation of 31 community school districts as semi-autonomous units of the New York City school system, employment and licensure in that system were, for all practical purposes synonymous. Termination of employment left the existence of such a license a hollow form, without any legal substance. Since the enactment of Education Law Article 52–A, however, where a teacher is dismissed from employment by one of these 31 community districts, he may be re-employed by any of the other 30 such districts, provided he holds a license. The license, therefore, is now a valuable property right and is entitled, as such, to the protection set forth in the decision in *Hecht v. Monaghan* [307 N.Y. 461, 121 N.E.2d 421 (1954)] and its progeny." (11 Ed.Dept.Rep. at 153).

Based on the changes caused by the statute, on *Baronat* and other authorities, Judge Korman determined that the plaintiff's complaint stated a cause of action for deprivation of property within the meaning of the Fourteenth Amendment, with regard to affording him a meaningful opportunity to seek a teacher's position in the New York City Public School System:

"Baronat thus recognized the teaching license as conferring something more than a 'unilateral expectation,' [*Board of*

*Regents of State Colleges v.*] *Roth, supra,* 408 U.S. [564] at 577 [92 S.Ct. 2701 at 2709, 33 L.Ed.2d 548 (1972)]—it recognized a 'legitimate claim of entitlement' with regard to the opportunity to seek employment in all thirty-one community school districts in the New York City school system. *Id.* Like the right to operate a vehicle pursuant to a driver's license recognized in *Bell v. Burson, supra,* 402 U.S. 535 [91 S.Ct. 1586, 29 L.Ed.2d 90] this 'claim of entitlement' could not be withdrawn without due process.

Because property rights are defined with reference to state law for the purpose of determining whether a deprivation of such property must be accompanied by due process, *Roth, supra,* 408 U.S. at 577 [92 S.Ct. at 2709]; *Goetz v. Windsor Central School District,* 698 F.2d 606, 608 (2d Cir.1983), and because New York recognizes a teaching license as conferring a 'valuable property right' to seek employment which may not be withdrawn without due process, *plaintiff states a cause of action for deprivation of property within the meaning of the Fourteenth Amendment.* Plaintiff's complaint can be construed to allege that, notwithstanding Education Law § 2590(e), vesting in the community school districts the exclusive power to hire elementary school teachers, *the Board has exercised a de facto power over the districts in order to prevent his employment and that of other teachers who, like plaintiff, failed to complete their probationary appointments. If true, this would constitute a cancellation of plaintiff's teaching license without the requisite due process hearing.*

This is not intended to suggest that defendant would be precluded from establishing a policy with respect to categories of teachers for which it is authorized to do the hiring (e.g., high school and Special Education teachers) to hire only teachers who successfully completed their probationary appointments. The Board could rationally decide that such a policy served its needs, and nothing in the Constitution would prevent it from doing so. Each community school district could likewise adopt such a policy with respect to elementary school teachers like Mr. Lombard. *What is significant here is the Board's alleged exercise of a de facto power over the community school districts contrary to state law in order to prevent plaintiff's employment.* The effect of this action is to diminish the property rights in the license recognized by New York law, i.e., the opportunity to seek employment in all thirty-one districts" (emphasis supplied).

As to the plaintiff's claim of a deprivation of his "liberty interest," Judge Korman held that the plaintiff failed to show that the alleged "stigma of fault" imposed on him was either false or stigmatizing or that it was made public, and this claim was dismissed. Also, as to the plaintiff's equal protection claim, Judge Korman held that the Board "could rationally draw a distinction between those teachers who have successfully completed their probationary appointments, and who thus have necessarily been adjudged satisfactory by their supervisors, and those who have not, even though there might be capable teachers in the latter category." Accordingly, the plaintiff's equal protection claim was also dismissed.

Thus the only issue left for adjudication before this Court is the plaintiff's claim that his property interest in his teacher's license was diminished without due process of law, by the actions of the employees of the defendant Board in depriving him of a meaningful opportunity to seek a teaching position in the New York City Public School System.

## THE TURPIN AND STATUTE OF LIMITATION PROBLEMS

The defendant Board raises two serious legal issues which require resolution before reviewing the evidence adduced at the trial. First, the Board contends that the plaintiff may not bring an action directly against a municipality under the Fourteenth Amendment, because the plaintiff has the right to

proceed under Section 1983. (*See Turpin v. Mailet,* 591 F.2d 426 [2d Cir.1979] *cert. denied sub nom. Turpin v. West Haven,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 [1980]). Second, the Board contends that the applicable statute of limitations governing an action directly under the constitution is three years.

■ Prior to the seminal decision in *Monell v. Department of Social Service,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) when there was no other remedy against a municipality, under certain circumstances an action based on a direct constitutional Fourteenth Amendment violation was permitted. A direct action for damages for violation of a Constitutional right was first allowed in *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics;* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). However, such a direct action under the Constitution can be maintained only where no other "equally effective or adequate" remedy exists. (*Carlson v. Green,* 446 U.S. 14, 18–19, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 [1980]; *Gleason v. McBride,* 715 F.Supp. 59, 62 [S.D.N.Y.1988]).

■ In *Monell,* the Supreme Court decided that under certain circumstances, a municipality could be liable under 42 U.S.C. § 1983 for a violation of constitutional rights. In *Turpin v. Mailet, supra,* the Second Circuit held that since a municipality could be subject to Section 1983 liability, a direct action under the Fourteenth Amendment was no longer available:

"The *Monell* decision does not call into question *Turpin's* central thesis that federal courts have the power—and the obligation—under the general federal question jurisdiction to create remedies to redress constitutional grievances. *See* [*Turpin v. Mailet,*] 579 F.2d [152] at 157–60 [ (2d Cir.1978) ]. An important element in our decision to imply a damages remedy against municipalities under the 14th Amendment, however, was that Congress had not supplied a vehicle by which the right in question could be vindicated. *Id.* at 157.

*Monell* held that § 1983 suits may be brought against municipalities under conditions essentially coextensive with those we imposed on the private right of action in *Turpin.* We therefore conclude that—under the very rationale of our prior opinion—there is no place for a cause of action against a municipality directly under the 14th Amendment,' because the plaintiff may proceed against the City of West Haven under § 1983. (591 F.2d at p. 427).

Since, under *Monell,* a municipality could be liable in a Section 1983 case only by showing a custom or policy, claimants have sought to avoid this limitation by asserting *Bivens*-type claims directly under the Fourteenth Amendment. In *Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 2722, 105 L.Ed.2d 598 (1989), the Supreme Court rejected the availability of a *respondeat superior* responsibility of a municipality under a *Bivens*-type action brought directly under the Fourteenth Amendment, as follows:

"Since our decision in *Monell,* the Courts of Appeals have unanimously rejected the contention, analogous to petitioner's argument here, that the doctrine of *respondeat superior* is available against a municipal entity under a *Bivens*-type action implied directly from the Fourteenth Amendment. *See, e.g., Tarpley v. Greene,* 221 U.S.App.D.C. 227, 237, n. 25, 684 F.2d 1, 11, n. 25 (1982) (Edwards, J.) ('Because Congress has elected not to impose *respondeat superior* liability under § 1983, appellant invites this court to expand the remedial options under *Bivens* . . . We can find no good logic nor sound legal basis for this view; we therefore decline the invitation'); accord *Owen v. Independence,* 589 F.2d 335, 337 (CA8 1978); *Thomas v. Shipka,* 818 F.2d 496 (CA6 1987); *Ellis v. Blum,* 643 F.2d 68, 85 (CA2 1981); *Cale v. Covington,* 586 F.2d 311, 317 (CA4 1978); *Molina v. Richardson,* 578 F.2d 846 (CA9), *cert. denied,* 439 U.S. 1048, 99 S.Ct. 724, 58 L.Ed.2d 707 (1978). Given our repeated recognition that the Fourteenth Amendment was intended in large part to embody and expand the projections of the

1866 Act as against state actors, we believe that the logic of these decisions applies with equal force to petitioner's invitation to this Court to create a damages remedy broader than § 1983 from the declaration of rights now found in § 1981. *We hold that the express 'action at law' provided by § 1983 for the 'deprivation of any rights privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.* Thus to prevail on his claim for damages against the school district, petitioner must show that the violation of his 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases" (109 S.Ct. at p. 2722) (emphasis supplied).

Relating the above principles of law to this case, the Court concludes that 1) the plaintiff's complaint is drawn as a direct cause of action under the Fourteenth Amendment, 2) the *Monell* standard of proof of a Board custom or policy is required in this direct action, and 3) where there is a Section 1983 action available, a direct action such as this is obviated.

In this case the *pro se* plaintiff has attempted to prove the diminishing of the property rights in his teacher's license without due process of law. The thrust of his case is that, in accordance with Judge Korman's opinion, the defendant Board has deprived him of his right to a meaningful opportunity to obtain employment at the thirty-two community school districts by reason of the acts of the Board's employees. In this regard, the elements of the plaintiff's direct Fourteenth Amendment cause of action are identical with the elements of a Section 1983 action based on the same alleged constitutional violation. First, the plaintiff must allege that the Board deprived him of a constitutional right, and second, he must allege that the Board deprived him of that right under color of state law. (*See Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 [1980]; Accord, *West v. At-*

*kins,* 487 U.S. 42, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 [1988]; *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979); *Flagg Bros. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1732, 56 L.Ed.2d 185 [1978]; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 [1970]). (*See also Section 1983 Litigation,* Second Ed. Schwartz and Kirkin, 1991).

■ Since the two causes of action are virtually identical, it would be most unfair to this *pro se* plaintiff and entirely unnecessary, to dismiss his direct constitutional action without leave to replead the exact same constitutional violation in the guise of a Section 1983 action. The Court notes that another paragraph in the complaint stating that, "in addition to the direct Fourteenth Amendment cause, the plaintiff alleges a Section 1983 cause of action," would have been sufficient.

However, even without the Section 1983 verbiage, the defendant Board is and has been fully aware that the plaintiff should have proceeded, technically, by way of a Section 1983 action. In its "trial memorandum of law" filed on September 9, 1991, the Assistant Corporation Counsel inserted a quote from *Pauk v. Board of Trustees of City University of New York,* 654 F.2d 856, 865 (2d Cir.1981) that "there is no place for a cause of action against a municipality directly under the Fourteenth Amendment because the plaintiff may proceed ... under Section 1983" (Defendant's trial memo at p. 3). In fact, the defendant's trial memorandum repeatedly set forth the argument that the proper action to be brought was under Section 1983.

In addition, the defendant Board will not be prejudiced in any manner if the Court deems the complaint to allege a cause of action under Section 1983, rather than a direct action under the Fourteenth Amendment. As stated above, the elements are identical; no further discovery is required; and the defendant Board had notice of the technical propriety of the Section 1983 rather than the direct action. Permitting an amendment of the complaint followed by a

second trial would countenance a repetitious, wasteful and needless exercise.

Accordingly, *sua sponte*, the Court deems the complaint conformed to the proof and amended so as to include a Section 1983 cause of action based on the same due process property violation as is set forth in the complaint.

■ The defendant Board's second legal argument with regard to the statute of limitations has merit. Following a long line of cases, the Second Circuit, in *Chin v. Bowen*, 833 F.2d 21 (2d Cir.1987), determined that whether the plaintiff proceeds by a *Bivens* direct action under the Constitution or a Section 1983 action, a single statute of limitations of three years, pursuant to New York Civil Practice Law and Rules § 214(5), is the applicable statute of limitations:

> "Both *Bivens* and section 1983 actions are designed to provide redress for constitutional violations. Though the two actions are not precisely parallel, there is a 'general trend in the appellate courts to incorporate § 1983 law into *Bivens* suits.' *Ellis v. Blum*, 643 F.2d 68, 84 (2d Cir.1981).... Accordingly, the *Okure* [*v. Owens*, 816 F.2d 45 (2d Cir.1987)] court's finding that section 1983 claims are most analogous to state claims covered by section 214(5) is strong authority for the application of that section to *Bivens* claims as well.

> . . . .

> We found that the three-year limitations period provided by section 214(5) is long enough to 'effectuate the policies embedded in section 1983,' and therefore does not discriminate against claims brought under section 1983. *Id.* at 48. Because the policies underlying *Bivens* actions are essentially the same as those underlying section 1983 actions, and the two actions share the same 'practicalities of litigation,' *Burnett v. Grattan*, 468 U.S. 42, 50, 104 S.Ct. 2924, 2930, 82 L.Ed.2d 36 (1984), the application of section 214(5) to *Bivens* actions would not discriminate against the federal claims raised in such actions."

Accordingly, only those acts which occurred within three years of July 22, 1985, the date of the filing of this complaint, can be considered with regard to the alleged constitutional violations.

Bearing the above principles in mind, the Court will now review the testimony and exhibits introduced at the trial.

### THE TRIAL

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a) (*see also Colonial Exchange Ltd. Partnership v. Continental Casualty*, 923 F.2d 257 [2d Cir.1991]).

During this discussion, the Court will make findings of fact which will be supplemented by additional findings later in the opinion.

#### The Plaintiff's Case

JOHN LOMBARD, *pro se*, testified in narrative fashion. He is fifty-three years of age, received a BBA degree from St. John's University and has done graduate work in business, education and psychology. He possesses a New York City teacher's license in common branches, for elementary school from kindergarten through the sixth grade. Lombard also possesses a regular substitute teaching license in Distributive Education. He also is the holder of permanent New York State certification in nursery school, kindergarten through sixth grade in day elementary school, and seventh through ninth grade in Social Studies, commercial subjects, marketing and salesmanship.

Lombard testified as to his teaching career with the Board, in chronological order, as follows:

*September 1, 1966*—Assigned as substitute teacher on a long term regular assignment to P.S. 25K.

*October 1, 1966*—By mutual agreement with the principals of P.S. 25K and P.S. 151Q he was transferred to P.S. 151Q without any break in service.

*1966/1967 School Year*—Rated satisfactory at the end of the school year.

*September 1, 1966 to September 1, 1969*—This was his three year probationary period.

*September 1967—June 1968*—In P.S. 151Q he received a satisfactory rating.

*September 1968—June 1969*—In the third year of his probationary period he received an unsatisfactory rating from the same principal.

*March 27, 1969*—Lombard received a letter from the principal with a statement of charges.

*June 1969*—Lombard received a notice from Dr. Sidney Liebowitz that he was on forced leave of absence by reason of a mental illness. He was sent to Dr. Morris Eisenberg, a panel psychiatrist, who presented him with a written statement of charges, which he denied.

*September 1969*—He was permitted to "sit" in school for ten days, with no notification as to his status.

*September 20, 1969*—Lombard received a letter from District Superintendent Mary Halloran stating that his continued presence in the school would not be tolerated. According to Lombard, the school authorities threatened to use police force to put him out if he resisted.

*Subsequent to September 20, 1969*—Lombard was found to be mentally unfit to teach in the schools after a panel of doctors examined him. He contends that he was never advised of this determination. In a letter from Chancellor Donovan, Lombard was advised that he could not work in any city school and he was placed on a leave of absence.

*1970*—Lombard was called to the Board and was interviewed for five minutes by Dr. Barbara Wright, a general practitioner. He was also referred to Dr. William Hezlich who did a cursory fifteen minute examination. He was notified that his medical leave was extended to the end of the school year in June 1970.

*September 1970*—Norman Cagen, a Morris High School department head called Lombard in for an interview, told him he was highly recommended by the Board and wanted him to replace a sick teacher. Lombard worked at the high school until February 1971 and received a satisfactory rating. Lombard also received a call from Abraham Gordon of Taft High School who told him that he received high recommendations from the Board, and gave him a teaching job in the business math class. Lombard worked at Taft High School until May 1971. Dr. Gordon "observed" him at Taft High School and praised his work in a lengthy report.

*May 1971*—Lombard had to leave Taft High School because a letter was received from the Board stating that his file number or circular number indicated he could not continue to work at that school. A payroll clerk told Lombard that he was on the "Invalid List" and he could not be paid. The principal wrote him a letter in which she said she was ordered to immediately terminate his employment.

Thereafter, Lombard managed to get occasional work in Manhattan schools, but he testified he was not being paid.

*March 1973*—Lombard visited the Board to inquire as to why he was not being paid. He was told that he would be paid but he was not permitted to work in the schools.

*April 1974*—Not being able to work as a teacher, Lombard obtained a retail liquor license. From April 1974 to July 1981, he operated a retail liquor store and also worked occasionally as a substitute teacher.

*November 15, 1977*—Lombard's Section 1983 action was dismissed by Judge Platt.

*1971 to 1979*—Lombard was told that his license was revoked and he was on the "Invalid List," and he could not teach. For example, in a letter dated May 23, 1973 from Gerald I. Brooks, Administrator, he was advised that "you hold no valid license and ... no compensation can be given for those days you may have worked since it was illegal to do so" (Plf's Exh. 16).

*January 1980*—For the first time, according to Lombard, he was told by Judge Platt that he had a valid license.

*1981*—From this time on Lombard was permitted to work as a substitute teacher— on a limited basis. He testified that on December 24, 1987, one Stanley Sebastian, Director of the Central Registry Section, told him he was on the "Invalid List" and, in addition, made a racial slur.

*1987–1988*—Lombard's substitute work dwindled. He received a letter from James T. Stein, Director of the Board Office of Appeals & Reviews, dated November 18, 1988, stating that "three additional complaints have been received from building principals for unsatisfactory service." He was asked to contact the office with three satisfactory references from other schools where he worked (Dft's Exh. G). After the Stein letter, he got no assignments whatsoever, because, although he answered the letter (*see* Plf's Exh. 15), he apparently did not respond to the "complaints."

*1990*—After the Central Registry was dissolved, he again started doing substitute work on a limited basis.

Lombard further testified that when he speaks to persons at the local school districts as to regular work, "they" say he had "troubles" and he was not hired for such work.

On March 8, 1981, Debra Baines of District 25 told him "you don't have a license, it's not showing on my computer." In addition, a payroll secretary at Flushing High School told him that there was something wrong with his license and referred him to the Central Board.

Testifying on August 27, 1991, Lombard stated that the last day he subbed was on June 14, 1991.

Concluding his direct testimony, in narrative form, Lombard testified that he was being punished for being a whistle blower and he did not "have an opportunity to work from 1971 to the present time."

On cross-examination, Lombard testified he did not recall the days he acted as a substitute teacher. The plaintiff offered a "Report on Teaching Services" dated November 2, 1973 (Plf's Exh. 20), which showed that from February 1971 to May 1971, the plaintiff served as a substitute teacher for 46 days. The defendant Board introduced a compilation of the days Lombard "served as a Per Diem Substitute Teacher in the New York City School System during the period from September 1978 to June 1988" (Dft's Exh. I), as follows:

| | |
|---|---|
| May 1979 to June 1979 | 6 days |
| Sept. 1979 to June 1980 | 35 days |
| Sept. 1980 to June 1981 | 75 days |
| Sept. 1981 to June 1982 | 157 days |
| Sept. 1982 to June 1983 | 49 days |
| Sept. 1983 to June 1984 | 125 days |
| Sept. 1984 to June 1985 | 134 days |
| Sept. 1985 to June 1986 | 109 days |
| Sept. 1986 to June 1987 | 119 days |
| Sept. 1987 to June 1988 | 147 days |
| Sept. 1988 to June 1989 | 27 days |
| Sept. 1990 to June 1991 | 57 days |

Lombard conceded that at frequent intervals from 1980, the Board told him to go to the local school districts to attempt to seek a job. Further, of importance with regard to the key issue in this case, the Board introduced a letter from Marie L. DeCanio, Deputy Executive Director, Office of Pedagogical Personnel, dated April 30, 1980, to Judy Levitt, Assistant Corporation Counsel, which reads as follows:

"Dear Ms. Levitt:

This is to advise you that Mr. John Lombard holds the following valid licenses:

Common Branches—Day Elementary School

Substitute Teacher of Distributive Education—Day High School

*As we discussed, the Board of Education will honor the request of any community superintendent who wishes to appoint Mr. Lombard.*

Mr. Lombard has been serving as a per diem substitute and has been paid on the per diem payroll. This is a monthly payroll and checks are mailed to the teacher's home.

If I can be of further assistance please do not hesitate to contact me" (Dft's Exh. D) (emphasis supplied).

Lombard conceded that, despite the April 30, 1980 letter by Ms. DeCanio, stating that the Board "will honor the request of any community superintendent who wishes to appoint Mr. Lombard," not one superin-

tendent or principal requested that he be hired on a permanent basis.

On redirect examination, Lombard stated that he did not get a request letter from principals because they had an excess number of teachers. He further testified that even though most of the schools knew that his former probationary term had been unsatisfactory, they hired him as a substitute teacher. Lombard contends that he is now restricted to only one district, number 24 in Ridgewood. He applied for a permanent position in District 24 but was told "they don't know."

Concluding his testimony, Lombard stated that the Board never gave him information on job openings; gave him the wrong information on job openings; discouraged him from looking for job openings except as to those positions known to the general public; and gave all "excessed" teachers priority over him. Lombard also complained that he does not get "other city jobs," for unspecified reasons. In sum, he stated "why have a license if he doesn't have the right to work?"

GENE CRESCENZI testified that he was an expert in "protected psychiatric rackets" and "the psychiatric modality of conduct." He is an attorney who practiced law for thirty years, specializing in mental hygiene and "the psychiatric racket" in the area of government. He stated that the subject matter of his testimony was in the field of "psychiatric abuse." He represented teachers accused of mental unfitness. Crescenzi stated that there was a "pattern" among five persons he named, who presumably were teachers found to be mentally unfit. The testimony of Crescenzi added little to the relevant material facts in this case.

JAMES T. STEIN is the Director of the Office of Appeals & Review. His duties include conducting hearings with regard to teachers whose probationary term was discontinued; hearing Step 2 and Step 3 grievances; investigating corporal punishment claims; and hearing appeals in Code 95 cases (complaints against substitute teachers between 1984 and 1989).

Stein knew Lombard as a teacher involved in a Code 95 case. In a Code 95 situation, the substitute teacher has received four letters from various principals who do not want his or her services. The teacher is given the opportunity to refute the complaints. In the event a teacher is charged with a Code 95 violation, he would not be sent out to jobs but would not be precluded from seeking employment himself in the school districts, other than the four complaining districts. In other words, according to Stein, Code 95 doesn't mean that the offender can't teach. This is in contrast to a Code 92 complaint, which is applicable in cases of corporal punishment by the teacher, which does involve preclusion from working and a full hearing, counsel and adversarial rights.

In the case of the plaintiff's Code 95, Stein testified that he never precluded the plaintiff from working. On November 18, 1988, Stein wrote to Lombard stating that "the Code 95 restrictions on your substitute privilege were removed" (Dft's Exh. G). However, in the same letter, he was advised that three additional complaints against him were received, for a total of seven complaints against Lombard as a substitute teacher.

On October 20, 1988, Anne M. Gargan, the principal of P.S. 180 in Queens wrote to the Director of Per Diem Organizations regarding the plaintiff as follows:

"Dear Mr. Blackman:
We request that Mr. J. Lombard, File No. 402024 be removed from our school's listing of prospective substitute teachers. Our school is an Early Childhood Center. We service children from Pre-K to Grade 2. Mr. Lombard demonstrated an inability to deal with young children. This inability resulted in several children being injured on the day he served at our school. These injuries occurred both in the classroom and on the stairs.
Thank you for your cooperation and attention to this matter" (Dft's Exh. H).

On the stand, Director Stein stated unequivocally and stipulated that Lombard has a valid teacher's license and that Stein never put him on the "Invalid File List."

Further, Stein stated that Lombard is not presently on the "Invalid File List." Stein further testified that although the Registry and the Central Board will not *send* Lombard out for work, he certainly can work in the local school districts where the principals have not made complaints against him. Further, Stein testified that the Code 95 complaints are not made a part of the plaintiff's personnel file and such complaints do not mark the plaintiff as an incompetent teacher.

Director Stein conceded that the day-to-day substitute teacher is the hardest job in the system. It is difficult to discipline students who know you are not coming back. In addition, many times the principal will place a day-to-day substitute in the "toughest" class, among difficult students so that the chance for a Code 95 complaint is easily fostered.

Finally, Stein stated that the plaintiff worked about one thousand days as a substitute teacher and only seven schools in the system complained about him. In view of that record, Stein stated that Lombard "must be a good teacher."

THOMAS C. MURPHY was a tenured New York City public school teacher for twelve years until 1976 when he was determined to be psychiatrically unfit for teaching. The Court finds his testimony to be irrelevant to any of the issues involved in this case.

JOAN GOLDBERG was the plaintiff's former attorney. She testified that in a letter dated January 26, 1979, from the payroll secretary of Junior High School 216 in Queens, Lombard was found to be on the "Invalid File List" and ineligible for employment (Plf's Exh. 9). Ms. Goldberg stated that she commenced this action in September 1985. No demand for a jury was made.

LOUISE MARKOWITZ is the Deputy Director for Budget & Personnel with the Division of High Schools. Prior to this assignment, she was employed at the Division of Human Resources since 1972, and for the period of 1983 to 1988, she was the Administrator of the Office of Staffing Services for Human Resources, which is the hiring arm of the Board. In this capacity, she worked for Howard Tames and Marie DeCanio. During the period of 1975 to 1981 she was in charge of all hiring for community school districts, including the hiring of regular permanent and regular substitute teachers, but not day-to-day substitutes.

The procedure in hiring a teacher is for the local school district to send the teacher to Ms. Markowitz with a request letter. A staff member would check that the prospective teacher had a valid license, and the teacher would then be hired.

Ms. Markowitz explained that at one time there was an "Invalid File Member List." If a teacher was on the list, upon inquiry, the district would be told and the person could not work. Even under decentralization, the Central Board must approve the hiring of a teacher.

Director Markowitz testified that she never told Lombard that his license was invalid or revoked. Further and significantly, Markowitz stated that even if a teacher has a probationary term discontinued, as did Lombard, he still possesses a valid teaching license, and he can work either as a substitute teacher or a regular teacher in another district, except if the person is dangerous or unfit. The rationale for this policy is that even if a teacher doesn't complete a probationary term, he or she is not necessarily unfit to teach somewhere else, except if the teacher is terminated as dangerous, which latter category did not apply to Lombard.

The Court credits the testimony of Director Markowitz and finds that even though he was terminated during his probationary term, plaintiff Lombard had a valid teacher's license, at least since 1979, and he could have been employed either as a substitute teacher or a regular teacher in school districts, other than the one in which he was discontinued.

As to the plaintiff's particular situation, Director Markowitz testified that she advised him of vacancies in certain districts, but those districts were not interested in hiring him, for unknown reasons. The

Court credits this testimony. Markowitz testified that, in such a situation, the local school district will communicate with the Central Board and be advised that Lombard was discontinued by another school. At that point, the local school must make a decision as to whether they will "take a chance" or not. On many occasions, the district will first try out such a teacher as a substitute. However, the results of a mental or psychiatric examination would not be given to the inquiring local school district and they would not receive that information.

Director Markowitz has known the plaintiff for about fifteen years. She gave him information on current vacancies and told him that "you must seek your own positions." She told Lombard "many, many times" how to seek employment in districts other than the one in which he was discontinued. The plaintiff was advised, apparently repeatedly, to go to the district which has a vacancy and get a "request letter" from the District Superintendent, to be brought to the Central Board. Ms. Markowitz testified that if this procedure were followed, the Central Board would approve the hiring, notwithstanding the prior probationary termination. Further, she stated that many teachers who were discontinued have been hired as substitute teachers and eventually were restored to regular teaching status. Stated otherwise, Director Markowitz testified that the Central Board will honor the hiring request of the local district, provided no extraneous problem exists, such as a budget constraint. So that while the Board would not initiate the search for a position for a discontinued teacher, it would let him find his own job and would approve such a hiring. The Court finds this crucial testimony to be credible.

Ms. Markowitz also testified about an incident at a recruitment drive at the La Penta Hotel. The plaintiff appeared and, according to Markowitz, he was disruptive, asked inappropriate questions and was escorted out. Markowitz explained that Lombard was seeking employment at the wrong forum, in that the La Penta recruitment was for starting teachers without a license.

Finally, Ms. Markowitz testified that she made no attempt to prevent the plaintiff from obtaining employment in the New York City school system, and stated that "we would be happy if he got a job."

FRANCINE H. NEWMAN was a high school physical education teacher for twenty-nine years. She testified that because she refused a request by her principal to falsify grades, she was directed to undergo a psychiatric examination. She was subsequently given an unsatisfactory rating and was "fired," allegedly without being given an opportunity to see her medical records. She stated that she, a tenured teacher, was discharged without a hearing. Ms. Newman stated that she noticed a "pattern" of disqualifying probationers. After litigation, in which she stated a doctor admitted that he made a false report and the principal admitted he made false charges, Ms. Newman testified that she was restored to a high school teaching position, until she retired in April 1985. The Court finds that little of this testimony is relevant to the issues in this case.

### The Defendant's Case

HOWARD TAMES has been the Director of the Office of Recruitment Personnel & Licensing since July 1990. Prior to that time, he was Deputy Director of the Division of Human Resources (the Division of Personnel) and Special Assistant to the Deputy Executive Director. He explained the nature of the various licenses at the Board. There are over 800 different licenses available.

A regular license is achieved after an examination. The teacher's name then goes on an eligible list and he is appointed in a probationary capacity, in a local school district, leading to tenure. A substitute license affords a teacher the opportunity to serve in less than an appointed capacity either as a full term temporary or on a day-to-day basis. Substitute teachers are called in by the school secretaries and/or by the central office of the district or by

any other mechanism set up to hire substitutes.

The Board maintains hiring halls or placement centers. Persons who pass the licensing examinations are first called for work according to their order on the lists. If there are no licensed teachers available, persons without a New York City license but authorized to teach by the State are then called in. As soon as a licensed teacher is placed in a probationary term, the teacher is removed from the eligible list.

Tames is familiar with the plaintiff's status and had reviewed his files. Lombard was licensed in 1966 with a common branch elementary school substitute license. On March 8, 1967, the plaintiff received a regular license as a common branch teacher. On October 8, 1968, he received a Distributive Education High School license. On September 6, 1967, the plaintiff was appointed from the list of licensed teachers but he never obtained tenure because he was discontinued in the midst of his probationary period.

However, according to Tames, even though Lombard was denied tenure, he was still licensed. Prior to decentralization, there was only one school district and if a teacher was terminated during a probationary term, he or she could not work under that license. After the decentralization law went into effect in 1969 and the subsequent significant *Baronat* decision, "the termination of probationary service ... does not result in the cancellation of the probationer's license" (Dft's Exh. B). Among other documents to the same effect, the United Federation of Teachers Handbook revised in 1976, contains the following language:

"A probationary teacher does not lose his license by virtue of an adverse probationary report. He may secure another position and begin a new probationary service" (Dft's Exh. C).

According to the terms of the *Baronat* decision, after decentralization, Lombard's license *was* a property right that affords him the right to work in any school district, other than the one that terminated his probationary term. At that time there were thirty-one school districts, and there are presently thirty-two such districts. Tames emphasized, however, that the Board does not refer teachers to other local school districts.

An April 26, 1973 memorandum from the Central Board to the Community School Board refers to the termination policy during a probationary term, as follows:

"8. Effect of Recent Decisions by Courts or *the State Commissioner of Education*

a. Cancellation of License

The termination of probationary service or denial of permanent appointment does not automatically result in the cancellation of the probationer's license. Such cancellation can be effected only after a formal trial on charges at which the probationer is entitled to be represented by legal counsel. The Bylaws of the Board of Education will be changed to reflect this ruling" (Dft's Exh. B).

Tames testified that if a probationer is discontinued in one school district, he is permitted to seek employment at any other school district. If a person obtains such employment, the Central Board would approve and reinstate that person to a new probationary term "without any obstruction." In fact, according to Tames, while not the norm, this situation occurred on at least three occasions. There was never such a request made by any Local School District on behalf of the plaintiff.

Further, Tames testified that if a discontinued teacher came to the Central Board, "we would tell him where to go to get another job." Tames has done this and so has his staff, by his direction.

Tames is familiar with the plaintiff, having met him at a deposition and one earlier occasion in 1980. He reviewed the record which showed that Lombard worked in the New York City School System as a substitute teacher for over one thousand days since 1970. The exact numbers were set forth above as stated in Dft's Exh. I. In addition to his many working days as a substitute teacher, Lombard worked at a variety of schools. In Manhattan, he worked at thirteen different schools and in

Queens, at sixteen different schools. Also, he taught at the same schools for a substantial number of days. For example, in Queens at High School 445 he taught 32 days in 1979 and 64 days in 1980–1981, and at Queens P.S. 440 he taught 110 days in 1981–1982.

Tames further testified that if a school district made a request to the Central Board to have a "discontinuance of probation" reversed and to reinstate the person into a new three year probationary period, such a request would have been honored. No such request was ever made by any school district on behalf of the plaintiff.

Addressing a key issue in this case, Tames emphasized that neither he nor any of the people working under him ever told a school district not to employ the plaintiff as a substitute teacher. Further, neither he nor anyone on his staff ever tried to prevent the plaintiff from obtaining a teaching position. There were no calls made, no writings or any steps taken by Tames or his staff in this regard. On the contrary, according to Tames, they gave Lombard lists of vacancies and he sought his own employment. The Court credits this testimony.

Tames explained that the "Invalid File List" is a list of file numbers and social security numbers distributed to each district, alerting the districts that certain persons should not be hired unless approved by the Central Board. He explained that by letter from Marie DeCanio, his predecessor, to Judy Levitt, dated April 30, 1980 (Dft's Exh. D), together with the annexed documents, it was stated that the plaintiff should not be on the Invalid File List and that he was eligible for employment. The letter stated that Lombard had two valid licenses and "the Board of Education will honor the request of any community superintendent who wishes to appoint Mr. Lombard." Annexed to the said letter is a memorandum from Philip W. Brady, of Personnel Security to Gary Benowitz of Pedagogical Payroll, dated April 25, 1979, entitled "John Lombard—Reinstatement to eligible status," which states in part, that "the above-mentioned individual ... be re-moved from ineligible listing and that he be paid for his substitute teaching service." The Court finds that any violations that occurred prior to the time the plaintiff was removed from the Invalid File List on April 25, 1979, are barred by the statute of limitations.

After receiving complaints from several principals who did not want Lombard to teach at their schools, Director Stein wrote to the plaintiff on September 28, 1987 restricting his privileges pending a review of the complaints (Dft's Exh. E). The plaintiff was requested to contact Stein's office with three satisfactory references. Notwithstanding this letter, Tames testified that the plaintiff could, nevertheless, be called in to teach at other school districts.

By way of Tames' testimony, the Board submitted five letters dating from October 8, 1985 to May 4, 1988, from local school districts complaining of the plaintiff's services as a substitute teacher (Dft's Exh. F). In a letter dated October 8, 1985, the Acting Community Superintendent of School District 30 in Queens stated that Lombard "is not to be employed as a per diem in any school in District 30Q." On June 30, 1987, the Assistant Principal of Long Island City High School wrote, as follows:

"The continual employment of Mr. Lombard, as a substitute teacher at Long Island City High School, would pose a danger to the health, welfare, and safety of our students.

Despite numerous conferences and discussions with Mr. Lombard, his classes continue to be disorderly and chaotic. Youngsters cut regularly throughout the building when he covered the program of an absent teacher.

I strongly recommend that Mr. Lombard no longer be employed at Long Island City High School. This recommendation is seconded by several other chairmen."

On September 21, 1987, the Assistant Principal of Long Island City High School wrote that "... we hereby make request that Mr. Lombard not be called to do substitute work at our school." The "reasons for our dissatisfaction" were also enclosed. On October 23, 1987, the Principal of P.S.

154 in Queens confirmed her request that Lombard "not be sent to my school." On May 4, 1988, the Assistant Principal of Junior High School 157 in Queens advised that together with four other teachers, Lombard was not to be hired for work in his school, because he "could not control classes."

On June 9, 1988, the Principal of P.S. 166 complained that Lombard was "unable to do the job. Rude towards Principal." On June 22, 1988, the Payroll Secretary of P.S. 86 wrote, on behalf of the Principal that Lombard "can't handle the class."

The interim Acting Principal of P.S. 82 of Queens wrote on October 28, 1988, as follows:

"Re: John F. Lombard

Per Diem Substitute Teacher

File # 402024

S.S. # 085–30–7095

Gentlemen:

Please do not send the above named per diem substitute to work in this school for the following reasons:

1. Teacher lacked control of class.

2. Teacher maintained a noisy classroom.

3. Teacher did not follow the absent teacher's lesson plans" (Dft's Exh. H).

As a result of these multiple complaints, Director Stein sent the November 18, 1988 letter to the plaintiff removing the Code 95 restrictions on his substitute privileges, but, in view of "three additional complaints," he was told to "bring three satisfactory references" in order to continue doing substitute work. However, even after these serious problems, the plaintiff was not restricted from obtaining a request from another school district for reinstatement to a new probationary term.

**DEBRA BAYNE** is employed at the Teacher's Registry at District 25. Among her duties is to take calls from teachers who are going to be absent and arranging for substitutes to be assigned. On September 3, 1991, she checked the plaintiff's status in the computer, which showed that he has a valid current license. No one at the Central Board or at District 25 told her not to hire the plaintiff as a teacher.

At this point both sides rested. The plaintiff's motion to amend his complaint, made at the conclusion of the trial, to add a RICO cause of action, is denied, as being patently legally insufficient on its face.

## ADDITIONAL FINDINGS OF FACT

1. While the other school districts were advised that the plaintiff's probationary term was discontinued, they would not be told about his psychiatric examinations and the results thereof.

2. Despite the fact that his original probationary period was discontinued, plaintiff Lombard still possessed a valid regular and substitute teacher's license.

3. As a licensed teacher, Lombard was not prevented by the defendant Board from finding another regular teaching position and a new probationary term in another local school district.

4. While the Board did not refer Lombard to the various local school districts, no one at the Board prevented him from obtaining employment at such school districts.

5. If any of the other thirty-one local school districts made a request for the plaintiff's prior discontinuance of probation to be vacated and for the plaintiff to be reinstated to a probationary term, the Board would have approved such request.

6. The plaintiff was provided with employment as a substitute teacher in the New York City Public School System for more than one thousand days, from 1971 to the present date.

## CONCLUSIONS OF LAW

1. The plaintiff failed to establish, by a preponderance of the evidence, that his property interest in his teacher's license was diminished without due process of law, by the actions of any of the employees of the defendant Board.

2. The plaintiff failed to establish, by a preponderance of the evidence, that any employee of the defendant Board deprived him, in any manner, of a meaningful oppor-

tunity to seek employment as a regular or substitute teacher in the New York City Public School System.

3. On the contrary, the evidence is clear that the plaintiff was afforded a meaningful opportunity to seek to obtain employment or to work in the New York City Public School System as a regular and substitute teacher and, in fact, he did work as a substitute teacher for a substantial period of time.

■ 4. Any violation by the Board during the time the plaintiff's name was improperly placed on the Invalid File List prior to 1979, is barred by the applicable statute of limitations.

■ 5. The plaintiff failed to establish, by a preponderance of the evidence, that the defendant Board exercised a *de facto* power over the local school districts in order to prevent the plaintiff's employment by reason of his failure to complete his probationary term.

■ 6. The plaintiff failed to establish, by a preponderance of the evidence, that the defendant Board had a custom, policy or regulation to deprive either the plaintiff, or a similarly situated discontinued probationary teacher, of a meaningful opportunity to seek employment or to work in the New York City Public School System.

## CONCLUSION

Accordingly, for the reasons stated, the Court directs the entry of a judgment in favor of the defendant Board, dismissing the complaint.

SO ORDERED.